May it please the Court, Counsel. My name is Elizabeth Crotty and I represent Michael Belmont. It is by no means easy or uncomplicated. By way of background, there were three charges and three convictions against Mr. Belmont in this matter. At this time, he only challenges two of those convictions. There were two separate aggravated battery counts. He challenges count one, which was the class X aggravated battery, and then he does not challenge count two, which was the aggravated battery premised on causing only bodily harm, but he does again challenge the aggravated domestic battery charge in count three. Now, the issue presented for this Court is that the State failed to prove beyond a reasonable doubt that Mr. Belmont knowingly caused great bodily harm to L.B. Great bodily harm is a necessary element of both of the convictions which he challenges today. Again, both of these require proof beyond a reasonable doubt that Mr. Belmont knowingly caused great bodily harm to L.B. And each word of these is important. The State relied on the totality of the injuries to the jury that great bodily harm was evidenced in this case. Was that inappropriate? That was not inappropriate in terms of that was their choice, their strategy, the evidence that they had to present at trial. The problem here is that they did not match that argument with proof that Mr. Belmont had caused all of the injuries, in particular the head injury, which was far and away the most severe injury and the one that both the Court and the State's experts argued was a severe injury. Now, in fact, the State's expert offered no real mechanism of injury, could not narrow down the time of the injury lower than a 48-hour window, and said it would be difficult to say whether this was one head injury or multiple head injuries. The evidence about injuries that the State relied on was, again, that expert and then two interviews of Z.B., one of Mr. Belmont's children in the home. And because it's not relevant, there's a complicated background about L.B.'s parentage and custody, which I will set aside unless the Court has questions. Z.B. was interviewed twice by different parties and provided some testimony which the State relied on as proof of causation. Yet it was inconsistent, contradictory, equivocal, and further did not support any injuries beyond those to the buttocks region from spanking. Z.B. told interviewers that no one in the household spanks L.B. He also told interviewers he had never seen his father spank him. He said later, my mom did once, my dad did once. Later that morphs into that his father had done so twice during that day. This is very inconsistent, conflicting. There's no explanation or support for those items. But more importantly, Z.B. was consistent and insistent that through both of these interviews that the spanking only occurred on the buttocks region, that he never saw any marks to L.B., and that he did not see L.B. get hurt except when he was playing outside. A very favorable interpretation of that testimony combined with Dr. Shaw's testimony, we can see it does support the second conviction that is premised only on bodily harm. What it does not support is the other two convictions that require great bodily harm to L.B. caused by Mr. Belmont himself. Again, there's no testimony that narrows down the mechanism of injury, the specific timing of the injury. And this is not a case where you have the child left alone with Mr. Belmont for a particular period of time. The injury occurred during that small window of time and he was the only person with L.B. and we know how the injury occurred during a period of time which would have been within the broader period of time that the doctor said the head injury occurred. We know that his wife ran across the street a couple times. We don't have any testimony that you would expect, well, and during that time we have testimony that L.B. was in bed because he wasn't feeling well. We know that some of this injury, he presented to the doctor with some degree of injury to his face which would be classified essentially as a head injury because the doctor describes it as abrasions and things to the eyebrow. Z.B. in his interview says, yes, L.B. had a lump on his head. So we know there was at least some injury to the head at a period well before this. And that was like a day before. That would have been, so October 30th was the doctor's appointment so that injury would have been beforehand. We know that there was testimony that L.B. fell when he was leaving the house to go show his grandmother across the street. His Halloween costume hit his face and head on the, on concrete essentially from falling down that step. Z.B. testified, not testified, spoke to the interviewers, said he did see him fall in the yard. Z.B. had I guess dug a hole near the fire pit, said L.B. fell and not. So we have a series of head injury events that may have occurred together. Except that the medical testimony ruled out that as a possibility and that they said that the injury to the brain was not consistent with what they were told about the fall on trigger treating or the bike incident. So what's important here is a couple distinctions. The expert did not hear about Z.B.'s account of the fall. The expert did not speak with the caretakers. She spoke with the mother who was not involved during this period of time. She reviewed some of the records. She did testify at trial. Oh, these wouldn't have been enough to explain all of these injuries. So based on the questions asked by both the prosecution and the defense in this case, there's no separation of this issue of, well, if it was a series of injuries, which of these could have caused what? We don't have that information. So there's a big question mark. So what we have is testimony from no one. We have no testimony from anyone that Mr. Belmont struck this child in any way at all except these possible spankings. We have affirmative testimony from Z.B. who would have been present through almost the entire period that he never saw anyone. And again, sorry, I keep saying testimony. He did not actively testify. The videos were played at trial. He says no one hurt him. I only saw him get hurt when he was playing outside. Casey Belmont, who was present except when running over to her mother's house across the street, has no testimony that Mr. Belmont did anything to L.B. and says that she was responsible for the disciplining of the children. And you have the two pageants who had interaction with this child at the same time. Now, yes, Mr. Belmont was in the house for a period of time, but certainly there's no narrowing down that that would have been the period of time. We have a guesstimate of what the injury would occur. We have no timing of any of the bruises. And we know the expert says things like, well, that looks like possible scabbing, which would be critical to the timing of these injuries. But she says possible scabbing. She doesn't narrow that down at all. In viewing one of the photos, she says, I think that's the knee. Yes, that's the left knee. So she's having some difficulty pinning down what the body parts are in these photographs, which were admittedly enlarged and grainy. So we don't have a particularly narrow window here for the specific injuries. You said there was a bump on the top of the head. So that couldn't happen from the tree or falling down in the yard, right? So there was an injury to L.B.'s sort of eyebrow or face that the doctor witnessed. What was the one that happened the day before? That was the 30th, yeah. The hospitalization was on the 2nd of November. The other child, Z.B., who was 6 years old at the time of the interview, said that he had a lump on his head. And that's a paraphrase. I could look up the exact language. There's not probing questions of the 6-year-old to narrow down where exactly that injury was, how exactly that occurred. And it was diffuse bruising. I'll save the rest for future questions. Was the indirect evidence enough where there were various injuries and no direct evidence that they were connected necessarily? Just for the record, would you state your name? I'm sorry. Good afternoon, Your Honors. My name is Valerie Osment, and I represent the people of the state of Illinois in this case. Osment? Yes, Your Honor. To Your Honor's question, are you talking about the various head injuries that Lucas had leading up to the time when he was taken to the hospital? Yes. So the expert testified, Dr. Shaw opined to a reasonable degree of medical certainty that although she can't pinpoint the exact time that the head trauma occurred, that it had to have happened within 48 hours leading up to when Lucas was taken to the hospital. And she also testified that there was no incident or car accident, anything like that, that was explained that could have pointed to any other reason why Lucas was subjected to this beating other than it being a direct result of child abuse. And when you're talking about car accident, we're not talking about being in a motor vehicle. You're talking about in a little, some type of little vehicle that the child himself was tooling around in? That's what I understood? Yes. No, sorry, Your Honor. I meant that the expert testified that because there was nothing as significant or extraordinary such as being in a car accident, that was explained. I didn't understand that because wasn't there testimony that the child had actually bumped into a tree in some kind of vehicle that... Yes, Your Honor. There was testimony about maybe being on a tricycle or a little toy car and ran into a tree. However, the expert also testified that that would not result in the severe head injury that Lucas was subjected to. And actually, the police officers, when they went over to interview Michael and Casey, they actually took a look at the children's toys and saw that there were minor scratches on these toys that would not be consistent with the type of injury that Lucas was subjected to. And what about the trip and fall during Halloween trick-or-treating? Yes, there was some testimony that Lucas might have fallen down some concrete stairs while he was trick-or-treating. However, and the expert also testified about that as well, that that would not have led to this type of injury. Moreover, Lucas went on that whole entire night just fine. After he fell, trick-or-treating, came home, was fine. And then there's actual testimony that Lucas did not leave the Beaumont household for those next three days leading up, or two days leading up to when he was taken to the hospital. But his, he had a brain swelling injury, right? Didn't he have head trauma? The child? Yes. And that would have taken some time to develop, theoretically. That's what the doctor says, 48 hours. Yes. So in the 48 hours prior to the time he was discovered, who was he with? I think Justice Chapman's question, is there any direct evidence or more circumstantial evidence? Yes, Your Honor. So the evidence that was presented at trial indicates that Lucas stayed at the Beaumont household for those two days leading up to when he was taken to the hospital. And the only people that he was around was two siblings, Zane and Mikayla, and his parents. But there was also testimony that the defendant was the only person that was left alone with Lucas during those periods of time. And that was twice on the day of the incident. So you say his parents. I'm sorry, Your Honor. His caretakers? Yes. The defendant being one of them. So I googled it, and I think that Lucas is their step-nephew, if that is accurate. Yes, I guess so. Because the grandparents live across the street or something like that. The biological grandfather lives across the street, and the step-grandmother. Okay, and so the mother is his aunt, is that right? I mean, not the mother. The daughter of the grandparent is his aunt, is that correct? So the biological grandfather, Mr. Padgett, who lived across the street, had a daughter, Melissa, and Lucas is Melissa's son. Casey is who the biological grandfather is married to, his daughter. So that makes them step-siblings. The defendant would be, I suppose by marriage, Lucas's step-uncle. I apologize for using the term parents. But the seriousness of these convictions, though, is you have a child with severe head trauma, and you don't have that window of time where you can prove isolation with the defendant. You do have evidence that the defendant had hit the child. Yes, Your Honor, and there was evidence and testimony. Actually, Tina Padgett, who is married to the biological grandfather, testified that twice Casey left the home on that day to go over to their house, leaving the defendant home alone with Lucas. For what period of time? The record is unclear. I believe one time was to go get some cornbread mix, so that might have been a quick trip. But the other time, she testified that she came over to visit, so that could have been an extended period of time. And then what about the tough ones? Did anybody notice anything about the child when she came back from that visit? So the child slept most of the day. He was tired, and he complained about not feeling well. But then again, Casey was the only person to testify for the defendant, and she is the defendant's wife. And so there was some credibility issues, I'm sure, and that was put before the jury, and the jury concluded that she was not a credible witness. But she also gave testimony about her husband having some kind of brain injury himself, that perhaps he had difficulty controlling his emotions and anger. What about that? Yes, Your Honor. So Casey testified, and so did Tina, I believe, that the defendant was involved in a three-wheeler accident in 2012, so a couple years before this incident took place, that led to him having some memory issues. And for that reason, she did not like to leave the children home alone with the defendant. However, she chose to do so on the day that this incident tragically happened. So when you say memory issues, I thought she said it was dangerous to leave him alone. What did that relate to? Just because he might forget about them, or that he might act out against them, or what? I mean, that can have a lot of different implications. Yes, Your Honor. I believe that Casey testified that she did not like to leave him home alone with him for fear that he might discipline him too much. I believe that there was testimony that led the jury to believe that the defendant might have taken a step too far in disciplining Zane before. And so for those reasons, she claims that she was the disciplinarian in the family. However, she chose to leave Lucas home alone with the defendant. But, you know, what seems to be absent in this case is extended kind of meanings that you see in other cases like this, where the child has suffered a traumatic brain injury, ultimately. You don't see that fortunately or unfortunately from a legal perspective. But from an evidentiary view, when you talk about circumstantial evidence, the child didn't suffer that kind of beating, at least according to the other children. How old was Zane? He's the one that gave the testimony, right, about the spanking? He was interviewed and the interviews were played before the jury twice. And how old was he? Six at the time, I believe, Your Honor. And Lucas was how old? Three. And he was in the process of being potty trained and there was evidence that may or may not have led to the aggression that the defendant exerted upon him because he was angry at the child for not being potty trained. And was he of a normal intelligence for a three-year-old or did he have special needs? Well, he was very young at the time, Your Honor, and he was also passed around from home to home. He was terribly neglected by his own parents and then by his grandparents and then ultimately the Belmonts. So I'm not entirely sure, and I don't believe the record made any of that any clearer, but knowing his circumstances and his home life and how he was bounced around and didn't have the greatest home life, then I would say he was probably maybe a little bit behind. You just said he was abused by his grandparents. Weren't they the pageants that were across the street? Yes, Your Honor. You're saying that they abused him as well? Well, I believe that it came out at trial or leading up to trial in the record that the reason why he started spending so much more time over at the Belmonts was not only so he could play with Zane, who was a little older than him, but also because he was being potty trained and they didn't want to deal with it either. So it was just a tragic situation where no one really wanted to take care of this child and unfortunately took it a step too far. And as the Illinois Supreme Court has said in People v. Jackson, a criminal conviction should not be overturned unless the evidence presented was so unsatisfactory or unreasonable or improbable that reasonable doubt of the defendant's guilt still remains and it's the State's position in this case that that is not the case. Your Honor, the defendant is essentially arguing that the jury was required to accept his version of facts to be true and if that was the case and the jury did believe him, then he wouldn't have been convicted. However, it's the jury's job and we trust juries every day and this jury was competent. We know from the record that there was a jury selected. So many hours went into picking this jury by both of the attorneys in this case. So many hours went into preparing for this trial that was heard before a very competent judge. All of the inferences are in the State's favor in this case and absent any sort of reasonable doubt still remaining in Your Honor's minds, this case should not be overturned. The jury did its job here and we should trust that that is exactly what they did. Thank you very much. First, I'd like to pick up on a point that Your Honor mentioned about the severity difference between these charges. Mr. Belmont was sentenced on the greatest charge to the maximum 30 years in prison. We're not asking that this court release him. We're asking that it uphold its duty not to rubber stamp a conviction by a jury and require that proof beyond a reasonable doubt be met of each element of each offense. And thus, we're asking that he be resentenced only on count two where we agree that given the inferences of the State at this procedural level, the burden was met, but only in that case. The facts of this case are upsetting. They're concerning. As the doctor mentioned, when we see these types of injuries, we are very concerned. But the hesitation in her ability to nail down what caused these, what the time frame was, that is not proof beyond a reasonable doubt. There's a difference between inferring from the facts and speculating from the facts. And to sustain proof of causation of great bodily harm beyond a reasonable doubt in this case, you have to speculate. There is call for concern. There's reason for suspicion. Probably there would be reason to remove the child from the home, do further investigation. But what there is not is proof beyond a reasonable doubt. As the State mentions, this was a child who was tossed around. He himself preferred to be at the Belmonts. There weren't, while you do have periods of time where Mr. Belmont was the only one in the home, the child was testified, everyone testified that the child had been sleeping that day. He wasn't feeling well. There's no disturbance observed on the way back. The Padgett's testimony, the husband and wife, grandparents, their testimony about the timing of that day was inconsistent and contradictory of each other. Certainly they would have been other potential suspects, as would have Casey. She was the one responsible for the primary care. And neither she nor anyone else testified that they were concerned about him being dangerous or violent, Mr. Belmont, that there were concerns about violence or anything like that. He was simply disabled and she was taking care of the more significant details of the care, the discipline, and wasn't leaving him without the resources to care for the children. Running across the street is a different thing than saying, you know, you're dangerous with our children, which was not the case. So, again, there's cause for concern here. There's reason to be suspicious. But those issues of suspicion and disbelief of Casey don't make the state's evidence different than it is. They don't make it more convincing or clear, which is the standard. We have to prove beyond a reasonable doubt each of these issues, the causation, the knowing causation, the great bodily harm. And for counts one and three, we don't have that here. For those reasons, we, unless the court has additional questions, we respectfully request that this court vacate Mr. Belmont's convictions on count one and count three and remand for a resentencing on count two. Thank you. Thank you very much. All right. This matter will be taken under advisement in order to do course. That completes the document for today.